UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SHARON MARTIN,

              Plaintiff,

   - against -

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
18-CV-3581 (RRM)

ROSLYNN R.  MAUSKOPF, Chief United States District Judge.

      Sharon B. Martin brings this action against the Commissioner of the Social Security

Administration ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking

review of the Commissioner's determination that she was not disabled and, therefore, ineligible

for Supplemental Security Income ("SSI") beginning on May 12, 2014.  Martin and the

Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  (Pl.'s Mot. (Doc. No. 23); Def.'s Mot. (Doc. No. 25).)  For the

reasons set forth below, the Commissioner's motion is denied, and Martin's motion is granted to

the extent that it requests that this matter be remanded to the Commissioner for further

proceedings.

## BACKGROUND

      Martin was born on February 9, 1978.  (Transcript ("Tr.") (Doc. No. 28) at 240.)[1]  She

obtained a GED in 1995, and attended college for a few months, though did not obtain a degree.

(Tr. 105–06.)  From 2002 until 2014, she worked as a school aide at George Westinghouse High

---

[1] Numbers preceded by "Tr." denote pages in the Administrative Transcript.

School and Brooklyn Technical High School and as a night custodian for the City of New York. (Tr. 131.)

On March 1, 2012, Martin was injured in a car accident that occurred when she was driving and hit a car that cut her off on its passenger side. (*Id.*) She was wearing a seatbelt but her airbag did not deploy. (*Id.*) She was treated at Kingsbrook Jewish Medical Center and was discharged the same day with advice to follow up. (*Id.*)

Over the next few days she complained of neck and lower back pain, seeking treatment on March 6, 2012, at DHD Medical P.C. by Raj Tolat, M.D., a physiatrist. (*Id.*) She reported problems with breathing, lifting, ambulating, performing chores, and carrying things. (Tr. 483.) Dr. Tolat recommended physical therapy five days per week for two weeks followed by three days per week for two more weeks. Martin received a Disability Certificate from DHD Medical stating that she was unable to work until April 3, 2012. (Tr. 586.)

She received two MRIs on March 9, 2012, one of the lumbar spine and one of the cervical spine. The MRI of the cervical spine revealed straightening of the normal cervical lordosis, C2-3 through C4-5 posterior subligamentous disc bulges flattening the ventral thecal sac, and C5-6 and C6-7 broad posterior disc herniations with central cord abutment. (Tr. 479.) The MRI of her lumbar spine revealed L5-S1 posterior central disc herniation with slight inferior extension from the disc space impressing the ventral epidural space and abutting the S1 nerve roots as they left the thecal sac. (*Id.*) A nerve conduction study performed on April 10, 2012, revealed evidence of right-sided C6 radiculopathy. (Tr. 496.) An electrodiagnostic study performed on the same day showed evidence of right-sided L4 radiculopathy. (*Id.*)

X-rays of the cervical spine were taken on March 12, 2012. Narayan Paruchi, M.D., a board-certified radiologist, found that they showed anterior osteophytes involving C5 and C6.

(Tr. 504.)  Dr. Paruchi also noted that X-rays of the lumbosacral spine showed a reduction in disc space height at L5-S1.  (Tr. 505.)

Martin received a Disability Certificate from DHD Medical on May 1, 2012, stating that she was unable to work until June 6, 2012.  (Tr. 585.)

On May 9, 2012, she saw Leonid Reyfman M.D., a pain medicine specialist, who diagnosed her with lumbosacral neuritis radiculopathy and lumbar disc displacement.[2]  (Tr. 492.)  He recommended that Martin receive an epidural steroid injection to manage her pain, which she received that same day.  (Tr. 493–94.)  Martin tolerated the epidural injection well and the procedure was performed without any complications.  (Tr. 494.)

Martin received a Disability Certificate from DHD Medical on June 6, 2012, stating that she was unable to work until June 26, 2012.  (Tr. 584.)  She received another Disability Certificate on June 26, 2012, that was valid until August 14, 2012.  (Tr. 583.)  On August 21, 2012, Martin was given an additional Disability Certificate that expired on September 18, 2012. (Tr. 582.)

Martin saw Dr. Reyfman again on September 24, 2012, complaining of lower back pain radiating to the right leg with numbness and tingling in her feet as well as constant aching and shooting pain.  She also brought up concerns of neck pain radiating to her left shoulder and sharp deep pain around her neck.  (Tr. 486.)  She reported concomitant fatigue, impaired work tolerance, and difficulty sleeping, concentrating, and performing activities of daily living.  (*Id.*) Dr. Reyfman diagnosed her with lumbosacral neuritis radiculopathy, lumbar disc displacement, and cervical disc displacement.  (Tr. 487.)  He recommended that Martin receive an epidural steroid injection and advised her to avoid repetitive, forceful, strenuous activities that might

---

[2] The medical records from her visit to Dr. Reyfman appear incomplete.

aggravate her lumbar disc displacement and to avoid activities like pulling, pushing, bending, lifting, or carrying anything heavy.  (Tr. 488.)

On November 27, 2012, Dr. Tolat opined that Martin had reached maximal medical benefit from formal physical therapy and discontinued it.  (Tr. 467.)  He also advised her that she could work as tolerated but cautioned her to be careful to not exacerbate her injuries.  (*Id.*)

Records for 2014

On May 21, 2014, Martin was treated by an orthopedic surgeon, Robert Copulsky, M.D. (Tr. 595.)  He noted decreased range of motion in the right shoulder that elicited discomfort on abduction against resistance and discomfort with forward flexion, tenderness over the right acromioclavicular joint, discomfort on bringing her right arm across her chest, and weakness of the external rotators.  (*Id.*)  X-rays of her right shoulder revealed arthritic changes at the right acromioclavicular joint, impingement of the right shoulder, and possible tendonitis of the right shoulder, but no acute bone pathology.  (Tr. 597.)

On June 27, 2014, Martin applied for disability and SSI.  (Tr. 71.)

Martin attended physical therapy sessions on September 10, September 15, and September 17.  (Tr. 669.)  On September 10, she described her neck pain as an eight out of 10 with constant dull aching.  (Tr. 670.)  She also described lower back pain that increased when performing functional activities.  (*Id.*)  The Physical Therapy Evaluation from that date notes that Martin had difficulty ambulating more than 1 block, bending, negotiating more than 1 flight of stairs, standing/sitting more than eight–nine minutes and lifting/carrying more than three–four pounds.  (*Id.*)  On September 17, it was noted that she was able to stand for 13 minutes during therapy.  (Tr. 669.)

On October 14, 2014, Martin received an X-ray of her lumbosacral spine and her right shoulder.  (Tr. 593–94.)  The spine X-ray showed that the height of the vertebral bodies and intervertebral disc spaces were relatively well maintained and the pedicles were intact throughout.  (Tr. 592.)  The shoulder X-ray showed no evidence of acute fracture, dislocation, or destructive bony lesion.  (Tr. 593.)

On October 14, 2014, at the Social Security Administration's ("SSA") request, Martin was examined by consultative examiner Ram Ravi, M.D., an occupational medicine specialist, who conducted an internal medicine examination at the request and expense of SSA.  Martin's chief complaints were pain in her lower back, right shoulder, right knee, and abdomen.  (Tr. 587.)  Martin reported difficulty with cooking, cleaning, laundry, shopping, showering, bathing, and dressing herself due to her pain.  (Tr. 588.)  She reported that she could lift, pull, push, and carry ten to 20 pounds with her left arm, and zero pounds with her right.  (Tr. 587.)

Martin rated her back, shoulder, and knee pain as a nine out of ten, and reported that she could not sit for more than ten minutes or stand for more than 15 minutes.  (*Id.*)  She reported that this pain was sharp and constant and that it alternated between sharp and dull.  (*Id.*)

Dr. Ravi noted that she appeared to be in no acute distress and had a normal gait and stance, though Martin was unable to walk on her heels and toes and declined squatting due to pain.  (*Id.*)  Dr. Ravi also noted that she needed no help changing for the exam, was able to get on and off the exam table without assistance, and was able to rise from a chair without difficulty. (*Id.*)  Martin declined radial and ulnar deviation of the right wrist due to pain.  (*Id.*)  She also denied a cervical spine lateral flexion due to pain.  (Tr. 589.)

Based on the exam, Dr. Ravi opined that Martin had moderate limitations with respect to sitting, standing, and bending, as well as marked limitations with respect to pushing, pulling,

lifting, and carrying with her right upper extremity.  (Tr. 590.)  He also opined that she had

moderate limitations with her right upper extremity and moderate limitations to pushing, pulling,

lifting, and carrying with her left upper extremity.  (*Id.*)  Dr. Ravi also found that Martin was

limited with respect to activities requiring fine manipulation with her right hand and might

require scheduled interruptions due to her history of abdominal pain.  (Tr. 591.)

Martin's disability claim was denied on October 22, 2014.  (Tr. 150)  The Findings of

Fact and Analysis of Evidence on the Disability Determination Explanation found that Martin's

impairment did not meet or equal any listing and that medical evidence in the file supported light

residual functional capacity ("RFC").  (Tr. 150–51.)  On December 5, 2014, Martin requested a

hearing before an administrative law judge ("ALJ").  (Tr. 171.)

<u>Record for 2015</u>

On January 1, 2015, Martin walked into the emergency room at Interfaith Medical

Center, complaining of loss of hearing in her right ear, pain, and dizziness.  (Tr. 690, 702.)  An

insect was removed from her right ear by an Emergency Department physician and she was

discharged the same day.  (Tr. 693, 705.)

Martin saw a board-certified physician assistant, Graciano Clause, on January 12, 2015.

(Tr. 653.)  She was complaining of a cough and right shoulder stiffness.  Clause noted that she

had not gone to an orthopedist for her right shoulder due to an insurance problem.  (Tr. 663.)

She was sent for an MRI without contrast.  (*Id.*)  Mr. Clause recommended physical therapy for

her lumbar pain.  (*Id.*)

On July 24, 2015, Martin saw Allen Meyer, M.D., an orthopedic surgeon.  (Tr. 599.)  He

found no gross deformity, swelling, or erythema in her right shoulder and noted that she had

good active range of motion in all planes, though she complained of pain at the extreme ranges

of motion.  (*Id.*)  Dr. Meyer also noted that her right elbow, forearm, and wrist were nontender

and freely mobile both actively and passively.  He found no gross neurovascular deficits.  (*Id.*)

Dr. Meyer's diagnoses included right shoulder pain, internal derangement of the right shoulder,

tendonitis, acromioclavicular osteolysis, and a Grade 2 SLAP tear.[2]  (*Id.*)  At this appointment,

Dr. Meyer also reviewed an MRI from October 2, 2014.  (Tr. 600.)  He noted that her AC joint

appeared inflamed, with effusion and marrow edema, distal clavicle, and that there was an

appearance most suggestive of AC joint osteolysis from repetitive exercise and trauma.  (*Id.*)  He

also reported that inflammatory arthropathy might be included.  (*Id.*)  He also noted that the

study was negative for partial or full thickness rotator cuff tear, mild tendinosis of distal

supraspinatus tendon with irregularity of the tendon's bursal surface.  (*Id.*)

Martin returned to the emergency room at Interfaith Medical Center on August 19, 2015,

complaining of severe back pain and an inability to walk.  (Tr. 714.)  She was discharged the

same day and was diagnosed with acute lower back pain.  (Tr. 715–16.)

Martin followed up with Dr. Allen Meyer on September 18, 2015.  (Tr. 601.)  Dr. Meyer

noted that she has been attending physical therapy up to two times a week.  (*Id.*)  On

examination, he found that Martin's right arm, forearm, and wrist were nontender and were

freely mobile, actively and passively.  (*Id.*)  He discussed the possibility of surgery with Martin

and he referred her to physical therapy again.  (*Id.*)

Martin was treated by Gene Kominer, a physical therapist, on September 22, 2015.  (Tr.

604.)  He noted that the pain has been gradual following no specific incident and has been

occurring in a persistent pattern for three years.  (*Id.*)  She claimed joint pain, joint stiffness,

---

[2] SLAP stands for superior labrum anterior and posterior.  According to WebMD, a SLAP tear occurs when the labrum is torn at the top in both the front (anterior) and back (posterior) of where it attaches to the biceps tendon. Grade 2 signifies that the superior labrum is completely torn off rather than a partial tear, which would be Grade 1. *See* https://www.webmd.com/pain-management/labrum-slap-tear (last accessed September 14, 2020).

muscle pain, and shoulder pain. (*Id.*) Kominer found moderate tenderness and Martin reported her pain as an 8/10. (*Id.*) Overall, Martin had at least nine appointments with Kominer through mid-October 2015. (Tr. 604–20.)

At Martin's October 13, 2015, appointment with Dr. Allen Meyer she complained of tightness and pain. (Tr. 602.)

At her October 16, 2015 physical therapy session with Kominer, Martin's pain had been reduced to a 5/10. (Tr. 620.)

On October 31, 2015, at the SSA's request, Martin was examined by consultative examiner Carol McLean-Long, M.D., an orthopedic specialist. (Tr. 622.) Martin's chief complaints were back pain, right shoulder cuff tear, and migraines. (*Id.*) Martin rated her right shoulder pain as a 6–9/10 and her back pain as a 5–6/10. (*Id.*) Martin reported that her pain re-occurred when she continued working and she was found to have a torn right rotator cuff. (*Id.*) She also reported that her back often gives up and gives out and that physical therapy did not improve it. (*Id.*) She claimed she could not lift anything heavy like a gallon of milk unless she used the other hand to assist that hand. (*Id.*) She also stated that she could walk only about two blocks, that such a walk would take her 15 minutes, that she could climb only about half a flight of stairs, and that she could sit and stand for about seven minutes at a time. (*Id.*)

Dr. McLean-Long noted that Martin's vision was 20/50 in the right eye, 20/200 in the left eye, and 20/50 in both eyes on a Snellen chart at 20 feet without glasses. (Tr. 623.) Dr. Mclean Long stated it was unclear what was wrong with Martin's left eye. (*Id.*)

Dr. McLean-Long also wrote that Martin appeared to be in mild distress but with a normal gait, and that she could walk on heels and toes without difficulty or an assistive device. (*Id.*) She also wrote that Martin needed no help changing for the exam and that she used the

8

table to get on and off the exam table, though she was able to rise from the chair without difficulty.

In her medical source statement, Dr. McLean-Long opined that Martin had moderate to marked ability to reach up, out, and backwards with her right upper extremity. (Tr. 629.) She also had moderate weakness in the right upper extremity. (*Id.*) She also had mild limitations in her ability to squat and to flex/extend the lumbosacral spine and the hips and knees bilaterally. (*Id.*)

Dr. McLean-Long also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on October 31, 2015. (Tr. 631–36.) She reported that Martin could lift and carry up to 20 pounds occasionally (very little to 1/3 of the time during work). (Tr. 631.) She stated that Martin had a right rotator cuff tear. (*Id.*) Dr. McLean-Long noted that Martin could sit or stand up to seven minutes at a time, for a total of two hours, and could walk up to 15 minutes without interruption. (Tr. 632.) In addition, she noted that Martin could walk a total of three hours in an eight-hour workday. (*Id.*) Dr. McLean-Long opined that Martin would require rest periods due to her back pain and rotator cuff tear and that Martin should never reach overhead or push/pull with her right hand, but could occasionally reach overhead and push/pull with her left. (Tr. 633.) She stated that Martin could occasionally reach in all other directions, handle, finger, and feel bilaterally, and could occasionally use foot controls. (*Id.*) Dr. McLean-Long opined that Martin could never climb ladders or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 634.) She also elaborated that Martin should never be exposed to unprotected heights, moving mechanical parts, vehicle operation, or vibrations, and could occasionally be exposed to humidity and wetness, dust, odors,

fumes, and pulmonary irritants, and extreme cold and heat.  (Tr. 635.)  In terms of noise, Dr. McLean-Long noted that Martin should only be exposed to a quiet environment.  (*Id.*)

On November 10, 2015, at the SSA's request, Martin was examined by consultative examiner Chaim Shtock, D.O., a physiatrist.  (Tr. 637.)  He noted that she stated that she was still doing physical therapy at that time.  (*Id.*)  He stated that she complained of right shoulder pain, lower back pain, and episodic headaches.  (*Id.*)  She had difficulty grading her pain from zero to ten, but stated that her shoulder pain was aggravated by overhead reaching, lifting, and carrying heavy objects, and relieved by rest and refraining from aggravating activities.  (*Id.*)  Martin reported that her headaches were often relieved by over-the-counter medication.  (*Id.*)  She also told Dr. Shtock that she could shower, dress, and groom herself, and could cook, clean, do laundry, and shop for her family with some assistance by her older daughter.  (Tr. 639.)

In terms of her general appearance, Martin appeared to be in no acute distress, her gait was normal, and her station was normal, and she used no assistive device.  (*Id.*)  Examination of Martin's extremities showed that her hand and finger dexterity were intact, and her grip strength was 4+/5 on the right and 5/5 on the left.  She had normal muscle tone in her upper extremities and no muscle atrophy.  (*Id.*)  She had a full range of motion in her left arm, and in her elbows, wrists, and fingers bilaterally.  (*Id.*)  She had a normal range of motion of her cervical and thoracic spine.  (*Id.*)

In his Medical Source Statement, Dr. Shtock opined that Martin had mild limitations with respect to squatting, kneeling, crouching, walking long distances, frequent bending, and standing for long periods.  (Tr. 640.)  He opined that she had no limitations with respect to sitting for long periods, but had marked limitation performing overhead activities using her right arm.  (*Id.*)  He

also opined that she had no limitation using both hands for fine and gross motor activity and that she had no other functional defects.  (*Id.*)

Dr. Shtock also filled out a Medical Source Statement of Ability to do Work-related Activities (Physical) on the same day as the exam.  He wrote that Martin could occasionally lift and carry up to ten pounds.  (Tr. 642.)  He opined that Martin could sit for one hour at a time without interruption, and for four hours total in a workday, and could stand and walk for two hours total in a workday.  (*Id.*)

In terms of use of her hands, Dr. Shtock stated that Martin could never reach overhead and occasionally reach in other ways.  (Tr. 643.)  He noted that Martin could handle, finger, feel, and push/pull frequently with her right hand, and do all of those things continuously with her left.  (*Id.*)  He indicated that she could operate foot controls continuously with her left and right feet.  (*Id.*)  When it came to postural activities, Dr. Shtock wrote that he felt she could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.  (Tr. 645.)  He thought she could occasionally climb ladders or scaffolds.  (*Id.*)  Dr. Shtock felt that none of her impairments affected her hearing or vision.  (*Id.*)

With regards to environmental limitations, Dr. Shtock felt that Martin could frequently be exposed to unprotected heights, humidity, wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibrations.  (Tr. 646.)  He felt that she could never operate a motor vehicle and could only occasionally move mechanical parts.  (*Id.*)  He noted that he believed Martin could be exposed to moderate noise.  (*Id.*)

He thought that based on her physical impairments she could shop, travel without a companion, ambulate without a wheelchair, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare simple meals and feed herself,

care for her personal hygiene and sort/handle files.  (Tr. 647.)  However, he thought that she could not walk a block at a reasonable pace on rough or uneven surfaces.  (*Id.*)

Martin saw Graciano Clause, P.A., again on November 10, 2015.  (Tr. 664.)  He referred her to an orthopedic surgeon and assessed a rotator cuff tear per MRI.  (*Id.*)  He also recommended a sonogram for right breast pain.  (*Id.*)  He noted that her right shoulder was painful with mild clicking and without swelling.  (*Id.*)

On December 9, 2015, Martin went to the emergency room for chest pain and shortness of breath.  (Tr. 750.)  Frontal and lateral examinations of the chest showed no pleural abnormality and that the lungs were clear.  (*Id.*)

Martin claimed self-employment of $7,200 as a hairdresser on her 2015 tax return.  (Tr. 109.)

Records for 2016

Mr. Clause prepared a General Medical Report on February 25, 2016.  (Tr. 653.)  He diagnosed Martin with right shoulder, lumbar, and right breast pain, as well as ligamental shoulder pain and stomach pain.  He also noted that she had episodic chest pain related to ongoing gastritis.  (*Id.*)  He opined that Martin has limited range of motion due to a rotator cuff tear as per MRI and would require physical therapy.  (Tr. 654.)  He recommended that she see an orthopedic surgeon for an evaluation.  (*Id.*)

Mr. Clause also filled out a Medical Source Statement.  (Tr. 656.)[6]  He wrote that he believed Martin could occasionally lift and carry up to ten pounds.  (*Id.*)  He also opined that she could sit for only ten minutes, stand for only twenty minutes, and walk for only twenty minutes during the entirety of an eight-hour workday.  (Tr. 657.)  He thought that she did not need a cane

---

[6] It is unclear if Mr. Clause filled out the Medical Source Statement on the same day as the general statement.

to ambulate.  He indicated that he believed Martin could reach, handle, finger, feel, push, and

pull occasionally with her left hand and her right hand.  (Tr. 658.)  He also believed that she

could occasionally operate foot controls with her left foot and her right foot.  (*Id.*)  Mr. Clause

believed that Martin could never climb stairs and ramps, climb ladders or scaffolds, balance,

stoop, kneel, crouch, and crawl.  (Tr. 659.)  He thought that Martin did not retain the ability to

hear and understand simple and oral instructions and communicate simple information but

thought she could use the telephone to communicate.  (*Id.*)  He also thought that Martin was not

able to read very small print or avoid ordinary hazards in the workplace, such as boxes on the

floor, doors ajar, or approaching people or vehicles.  (*Id.*)  He opined that she could view a

computer screen, read the print in an ordinary newspaper or book, and discern differences in

shape and color.  (*Id.*)  In terms of environmental limitations, Mr. Clause believed that Martin

could never be exposed to unprotected heights, moving mechanical parts, operating a motor

vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat,

and vibrations.  (Tr. 660.)  He also believed that she could not tolerate exposure to any more

noise than quiet.  (*Id.*)

Martin attended physical therapy on March 3, 2016.  (Tr. 666.)  She had dull neck pain

that she rated as eight out of ten.  (*Id.*)  Martin described her neck pain as starting two weeks

prior and stated that it was constant, that it began with morning stiffness and pain that traveled

down into her left arm, shoulders, and upper back, and that the pain increased during the day.

(*Id.*)  Martin also reported that she occasionally felt tingling sensations radiating from her left

arm into her left hand.  She had observable muscle spasms in the upper back area and positive

distraction and Spurling tests.  (*Id.*)  Regarding functional skills, Martin had difficulty lifting and

carrying more than two to three pounds, and difficulty comfortably performing overhead

activities, as well as pushing and pulling activities, cooking, peeling, cutting, and mixing more

than ten minutes, as well as sitting at the computer more than 12 minutes and looking up and

down.  (*Id.*)  Martin also attended physical therapy on March 4, 2016, March 7, 2016, March 31,

2016 April 6, 2016, and April 11, 2016.  (Tr. 667.)

On April 11, 2016, Martin stated she could use the computer sitting and typing for up to

20 minutes.  (*Id.*)

Martin was treated at the Interfaith Medical Center emergency room on April 23, 2016

for acute low back pain and an upper respiratory infection.  (Tr. 648.)  She was diagnosed with

acute pharyngitis, acute bacterial tonsillitis, acute sinusitis, and muscle spasm of the back.  (Tr.

795.)  The emergency room doctor noted that Martin had full range of motion in her neck, her

back and her extremities, and had no motor or sensory defects.  (Tr. 794–95.)

Social Security Hearing:

A hearing was held by the Social Security Administration Office of Disability

Adjudication and Review on June 30, 2016.  (Tr. 95.)  Martin was not represented by counsel.

(Tr. 94.)  The ALJ reviewed medical documents from BHD Medical, an unnamed Social

Security Doctor from 2014, Dr. Copulsky, Dr. Meyer, Dr. Shtock, Mr. Clause, and Interfaith

Medical Center.  (Tr. 104–08.)  The ALJ asked Martin if she had any other medical records and

she said probably but she was unsure.  (Tr. 108–09.)  The ALJ said he would try to get the

records from Interfaith on her behalf.  (Tr. 109–10.)  While interviewing Martin, he asked her

about her education and job history from the past 15 years and asked her to describe her injuries

in her own words.  (Tr. 105–32.)  The ALJ asked Martin about $7,200 that she reported on her

2015 tax return in self-employment as a hairdresser.  (Tr. 108–10.)  Martin explained that a

friend who was doing her tax preparation had told her that if she reported self-employment, she

would get some earned income tax credit.  (Tr. 109.)  However, Martin testified that she did not

work but reported self-employment "to get some money" and "try[] to survive."  (*Id.*)

The ALJ interviewed vocational expert, Gerald Belichik, Ph.D.  (Tr. 126.)  Dr. Belichik

classified Martin's past relevant work as school monitor, based on the Department of Labor

Dictionary of Occupational Titles. (Tr. 132–33.)  He stated that it is considered unskilled, with

light exertional level that may rise to medium.  (Tr. 133.)

The ALJ posed several hypotheticals to Dr. Belichik.  He first described someone with a

dominant right upper extremity, who was limited to occasional pushing or pulling with postural

limitations and cannot climb ropes ladders, or scaffolds.  (Tr. 133.)  The hypothetical person

could occasionally stoop, crouch, and kneel but was limited to frequent reaching and never

overhead.  (Tr. 133–34.)   Dr. Belichik opined that such a person could not be a school monitor

because of frequent stooping and overhead reaching, but could be a production assembler

because it is limited to occasional stooping and no overhead reaching.  (Tr. 134.)  There are

219,000 of those jobs in the national economy.  (*Id.*)  He opined that the person could also be an

usher because it involves no stooping, and is a light exertional level.  (Tr. 135.)  This type of job

has 76,000 jobs in the national economy.  (*Id.*)  Lastly, Dr. Belichik stated that the person could

be a single item cashier, with over 3 million jobs in the national economy.  (*Id.*)

A second hypothetical posed by the ALJ involved someone who was limited to light

work but could only perform lifting and carrying with her non-dominant left hand.  (Tr. 136.)

The person could never push or pull with the dominant right upper extremity, (*id.*), would not be

able to climb ropes, ladders, or scaffolds, (Tr. 137), and could only occasionally stoop, crouch,

and kneel, (*id.*).  The person could only occasionally reach with the dominant right arm, though

never overhead, but could frequently handle and finely manipulate objects with that arm.  (*Id.*)

15

Dr. Belichik opined that such a person could still be an usher, but not a cashier and could not work on a production assembly job. (Tr. 138.) However, because the person could write, she would also be able to work as a rental clerk – an unskilled job with 77,000 positions in the national economy – or a hostess – a light exertional job with 67,000 jobs in the national economy. (Tr. 138–39.)

In a third hypothetical, the person was limited to light work but can only perform lifting and carrying with her non-dominant left hand. (Tr. 139.) The person would never be able to push or pull with the dominant right upper extremity; could not climb ropes ladders, or scaffolds; and could only occasionally stoop, crouch, and kneel. (*Id.*) The person could occasionally perform fine manipulation with the dominant right upper extremity. (*Id.*) Dr. Belichik testified that such a person might be able to perform sedentary jobs, but that there would be regulations with their condition that would not permit them to do sedentary work, so there would be no jobs such a person could perform. (Tr. 140.)

<u>The ALJ's Decision</u>

On January 20, 2017, the ALJ denied Martin SSI benefits. (Tr. 71–80.) Following the five-step sequential evaluation for adjudicating Social Security disability claims, 20 CFR §§ 404.1520(a) and 416.920(a), the ALJ reviewed the evidence of record and found at step one that Martin had not engaged in substantial gainful activity since May 12, 2014, the alleged onset date. (Tr. 72–73.) At step two , the ALJ found that Martin had severe impairments which included right shoulder derangement with SLAP tear, AC osteolysis, and lumbar strain. (Tr. 74.)

The ALJ found that at step three, Martin did not have an impairment or combination of impairments that met or medically equaled the criteria of any of the impairments listed in 20

C.F.R. part 404, subpart P, appendix 1. He found that Martin had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with additional limitations. (Tr. 74.)

The ALJ found that Martin's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 75.) He found that Martin did not provide sufficient basis to discount her ability to perform light work; she had not reported significant problems with walking, standing, or sitting, and her back problems were described as acute and responsive to treatment. (*Id.*) He also noted the fact that she did light work and used her upper extremities as a hairdresser in 2015. (*Id.*)

The ALJ gave partial weight to the Medical Source Statement by Mr. Clause because he only saw Martin on two occasions, 10 months apart. (Tr. 77.) Mr. Clause's assessment was inconsistent with the MRI and with her work activity as a hairdresser. (*Id.*) The ALJ thought that Mr. Clause's Medical Source Statement lacked objective findings, including imaging. (*Id.*)

The ALJ gave limited weight to Dr. Ravi's consultative exam on October 14, 2013. (*Id.*) He found that Martin was able to perform self-employment work that indicated that she had more ability than she noted in her presentation to Dr. Ravi. (Tr. 78.) The ALJ also gave limited weight to Dr. McLean-Long[3] who evaluated Martin in October 2015 because Dr. McLean-Long's treatment notes do not document long-term limitations in Martin's ability to sit, stand, and walk for significant periods of time. (*Id.*) The ALJ also gave limited weight to Dr. McLean-Long because Martin did not report problems with buttoning, tying, and zipping to other physicians but she did report them to both Dr. McLean-Long and Dr. Ravi. In addition, the ALJ

---

[3] ALJ Penalver's decision refers to the assessment of "Dr. Long." The Court assumes this reference to be to the assessment of Dr. McLean-Long.

found that Martin claims to Dr. McLean-Long regarding her inability to use her right hand were inconsistent with her ability to perform work as a hairdresser.  (*Id.*)

The ALJ gave ample weight to Dr. Shtock, but did not credit the restrictions in Dr. Shtock's Medical Source Statement because they were inconsistent with the narrative medical source statement and were not supported by Dr. Shtock's express findings on examination or the other evidence of record.  (*Id.*)  He noted that Dr. Shtock's notes reflect that Martin was able to perform household duties, and had only mildly reduced strength in the right upper extremity and no evidence of muscle atrophy.  (*Id.*)  The ALJ also noted that she had no limitation in using both her hands for fine and gross motor activity, and she had no limitations in sitting long periods and only had mild limitations with squatting, kneeling, crouching, frequent stair climbing walking long distances, standing long periods, and frequent bending.  (*Id.*)  The ALJ concluded that Martin did not have significant limitations in her ability to sit, stand, walk, or use her left upper extremity.  (*Id.*)

At step four, the ALJ found that Martin could not perform her past relevant work.  (*Id.*)  However, at step five, the ALJ found that, considering Martin's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform, including representative occupations such as usher, rental clerk, and hostess.  (Tr. 79.)  Accordingly, although the ALJ found that Martin met the insured status requirements of the Social Security Act through December 31, 2018, (Tr. 73), he denied her application for a period of disability and disability insurance benefits, finding that Martin was not disabled under sections 216(i) and 223(d) of the Social Security Act.  He also denied her supplemental security income application filed on June 27, 2014, finding Martin was not disabled under section 1614(a)(3)(A) of the Social Security Act.  (Tr. 80.)

18

On April 19, 2018, the Appeals Council denied Martin's request for review, rendering the ALJ's decision the final determination of the Commissioner.  (Tr. 1.)

The Instant Action:

On June 20, 2018, Martin commenced this action, seeking reversal of the decision of the Commissioner of Social Security pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), 1383(c)(3).  Martin and the Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

In Martin's Memorandum of Law, Martin argues, that the Commissioner's decision should be reversed, and the matter remanded for a directed finding of disability and calculation of benefits.  (Memorandum of Law ("Pl. Memo") (Doc. No. 23).)  Alternatively, Martin seeks remand for further administrative proceedings, including a *de novo* hearing and new decision. (Pl. Memo at 24.)  Martin argues, among other thing, that the ALJ failed to properly evaluate the opinion evidence, resulting in an RFC determination that is not based on substantial evidence and that the ALJ disregarded portions of Dr. Shtock's opinion without sufficient reasons for doing so.  (Pl. Memo.)

The Commissioner controverts those arguments in his Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings, arguing that the ALJ properly disregarded the doctor's opinions and correctly determined that Martin has the residual functional capacity to perform light work.  (Defendant's Memorandum of Law ("Def. Memo" (Doc. No. 25) at 20–28.)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. §

1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the Commissioner's factual determinations.  Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the

20

same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration.  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

<u>Eligibility for SSI</u>

In order to be eligible for SSI, an individual must be blind, aged or disabled and fall within certain income and resource limits.  *See* 42 U.S.C. §§ 1381, 1382(a).  An adult individual is "considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 1382c(a)(3)(A).  The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).  The term, "work which exists in the national economy," is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  (*Id.*)

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework set forth in 20 C.F.R. § 416.920(a)(4) and described above.  "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework."  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotations and citations omitted).  Nonetheless, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative

obligation to develop the administrative record." *Id.* (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)).

## DISCUSSION

Federal judges have enforced a rule that "an ALJ must acknowledge all evidence that supports a claim of disability." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010). Under this rule, if the ALJ disagrees with that evidence "he must explain why the pertinent evidence does not justify the result sought by the claimant." (*Id.*) This is in order to make sure that the ALJ does not "'pick and choose' evidence in the record that supports his conclusions." (*Id.* at 434) (quoting *Wiggins v. Barnhart*, 2002 WL 1941467, at *7 (S.D.N.Y. Aug. 21, 2002)). The ALJ cannot overstate the extent of a claimant's work in order to discount the opinions of doctors and claim that they are inconsistent with the claimant's activities. *Manning v. Astrue*, 2010 WL 2243350, at 6 (N.D.N.Y. Apr. 30, 2010) (remanding when ALJ "overstated the extent of certain of Plaintiff's activities and made assumptions about other activities that are not supported by the record"). This is especially troublesome when the ALJ does not provide a comprehensive statement of his reasons for discounting a medical assessment. (*Id.*)

Federal regulations explicitly authorize a court reviewing decisions of the SSA to order further proceedings when appropriate. 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82–83 (quoting *Pratts*, 94 F.3d at 39) (internal quotation marks omitted). Remand is particularly appropriate where further findings or

22

explanation will clarify the rationale for the ALJ's decision.  *Pratts*, 94 F.3d at 39.  However, if

the record before the Court provides "persuasive proof of disability . . . a remand for further

evidentiary proceedings would serve no purpose," and the court may reverse and remand solely

for the calculation and payment of benefits.  *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d

Cir. 1980); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013).  In cases of "cherry-

picking," "remand is particularly appropriate where … [a court is] 'unable to fathom the ALJ's

rationale in relation to the evidence in the record' without 'further findings or clearer explanation

for the decision.'"  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Berry v.

Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).  This includes when an ALJ fails to ask any

follow-up questions of a plaintiff who is unrepresented by counsel, as "the ALJ has an obligation

to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless

of whether the claimant is represented by counsel."  *See Cruz v. Barnhart*, 343 F. Supp. 2d 218,

224 (S.D.N.Y. 2004) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).

  With the exception of portions of Dr. Shtock's opinion, which was internally

inconsistent, none of the physicians who treated or examined Martin supported ALJ Penalver's

assessment that Martin is capable of sedentary, much less light work.  Dr. Ravi opined that

Martin has moderate limitations with respect to sitting.  (Tr. 590.)  Dr. McLean-Long opined that

Martin could sit or stand up to seven minutes at a time, for a total of two hours, and could walk

up to 15 minutes without interruption.  (Tr. 632.)  Mr. Clause opined that Martin could sit for

only ten minutes, stand for only twenty minutes, and walk for only twenty minutes during the

entirety of an eight-hour workday.  (Tr. 657.)

  Dr. Shtock opined in two contemporaneously completed documents on Martin's ability to

sit for long periods.  In his Medical Source Statement, Dr. Shtock opined that Martin had no

limitations with respect to sitting for long periods.  (Tr. 640.)  However, in his Medical Source
Statement of Ability to do Work-related Activities (Physical), he wrote that Martin could sit for
one hour at a time without interruption, and for four hours total in a workday, and could stand
and walk for two hours total in a workday.  (Tr. 642.)  Therefore, in order to reach his conclusion
that Martin did not have significant limitations in her ability to sit, (Tr. 78), ALJ Penalver relied
solely on the first statement from Dr. Shtock's Medical Source Statement and ignored the
contemporaneous statement contradicting it.  Penalver thus also ignored that every other doctor
and consulting examiner opined that Martin was incapable of sitting for up to six hours.  At the
very least, ALJ Penalver had a duty to "investigate and develop the facts and develop the
arguments both for and against the granting of benefits," *Butts v. Barnhart*, 388 F.3d 377, 386
(2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005), and therefore should
have investigated Shtock's opinion further when he contradicted himself.

Further, ALJ Penalver discounted the opinions of Dr. McLean-Long, Dr. Ravi, and Mr.
Clause, based in part on the inconsistency between their opinions regarding Martin's 2015 tax
return, which indicated that she worked as a hairdresser despite Martin's denial that she
performed this work.  The ALJ's decision states:

> I give partial weight to the Medical Source Statement by PA Clause . . . . This
> opinion is [] inconsistent with the claimant's work activity as a hairdresser in
> 2015 . . . The fact that the claimant was able to perform self-employment work
> activity as a hairdresser in 2015 documents that she had more ability to use her
> right dominant hand than noted in her presentation to Dr. Ravi. . . . Again, the
> claimant's work as a hairdresser in 2015 documents that she has greater ability to
> use right hand than she reported to Dr. [McLean-]Long.

(Tr. 77–78.)  However, Martin denied working as hairdresser and explained that her friend
helped her falsely report work as hairdresser on her taxes in order to help her get earned income
credit because she needed the money to "try[] to survive" because she "was desperate for money
to feed [her] kids" but in fact "[she] was not working."  (Tr. 109–10.)  Apart from her 2015 tax

24

return, nothing else in the record suggests that Martin worked as a hairdresser and she testified

that she had no W-2.  The entire colloquy between Martin and the ALJ on whether she was a

hairdresser is covered in two and half pages of transcript from the hearing.  (Tr. 108–10.)  Based

on this cursory discussion of Martin's income tax return, the ALJ concluded that Martin worked

as a hairdresser in 2015, and used this fact to discount the medical opinions of Dr. McLean-

Long, Dr. Ravi, and Mr. Clause.  The ALJ did not seek any additional information about whether

Martin did or did not perform this work.  While the Court agrees with the Commissioner that,

had Martin performed this work, it would be relevant to whether Martin could perform

substantial gainful activity, it is far from clear based on the record before the Court that Martin

performed this work.  In addition, Penalver did not ask Dr. Belichik for his expert opinion on the

level of work a hairdresser does, relying on his own assumptions.

     While the ALJ was free to assess the evidence and reject that which he found

unpersuasive, the ALJ must explain, and not simply mention, why the evidence does not justify

the result.  *Correale-Englehart v. Astrue*, 687 F. Supp. 2d at 434.  The ALJ failed to do so here.

ALJ Penalver must address the evidence provided by Dr. McLean-Long, Dr. Ravi, and Mr.

Clause that supports Martin's claims and provide an explanation of why this evidence does not

justify the result sought by Martin.  This may include further findings on whether Martin worked

as a hairdresser, should the ALJ consider it as a reason to diminish the weight he assigns to a

medical assessment.

**CONCLUSION**

     For the reasons set forth above, the Commissioner's motion for judgment on the

pleadings is denied and Martin's motion for judgment on the pleadings is granted to the extent it

seeks remand.  This matter is remanded to the Commissioner of Social Security for further

25

proceedings consistent with this Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

                                               SO ORDERED.

Dated: Brooklyn, New York                      *Roslynn R. Mauskopf*
       September 29, 2020

                                       _____
                                       ROSLYNN R. MAUSKOPF
                                       Chief United States District Judge